UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BRAD WARRINGTON,

Plaintiff,

v. Case No. 2:22-cv-77-KCD-KRH

RAKESH PATEL and ROCKY PATEL PREMIUM CIGARS, INC.,

Defendants.

---

**ORDER**

Plaintiff Brad Warrington is a minority shareholder in Defendant Rocky Patel Premium Cigars ("RPPC"). As Warrington tells it, the company's namesake and majority shareholder, Defendant Rocky Patel, treats the business as a personal piggy bank while starving Warrington of distributions. Apparently fed up, Warrington attempted to offload his shares to a third party. But Defendants allegedly thwarted the sale, spurring this lawsuit. Defendants, for their part, have filed a counterclaim against Warrington for "breach[ing] his fiduciary duty to the Company by threatening to release information damaging to the Company and its reputation, solely in order to

enhance leverage for a[n] outsized purchase of his minority position." (Doc. 194 at 7; *see also* Doc. 170.)[1]

Both parties now seek summary judgment on various parts of their respective claims. (Docs. 413, 416.) For the most part, a jury will have to untangle the messy factual disputes underlying Warrington's affirmative claims. But because Warrington is not, as a matter of law, a majority or controlling shareholder of RPPC, the Court grants summary judgment on Defendants' counterclaim.

## I. Background

The broad strokes of this business divorce are uncontested. To the extent material facts remain in dispute, the Court addresses them in the analysis below, viewing the record "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Warrington's business relationship with Patel began in 1996, when Warrington invested roughly $35,000 into RPPC. (Doc. 413 at ¶ 1.) Two years later, the parties executed a "Buy-Sell Agreement." (*See* Doc. 413-1 at 17.)[2] Several provisions are relevant here. First, Section 2.01 required "[a]ny

[1] Unless otherwise indicated, all internal quotation marks, citations, and alterations have been omitted in this and subsequent citations.

[2] For ease of reference, the Court will cite the page numbers generated by its electronic filing system for all exhibits.

Stockholder who desires to sell or transfer all or any part of the shares" to "notify the proposed transferee of the terms of [the Agreement]" and "give written notice thereof to the Corporation[,]" specifying "the number of shares to be disposed of, the name of the proposed transferee, and the amount and terms of the consideration to be reviewed for the shares." (*Id.* § 2.01.)

Once a shareholder gives notice, Section 2.02 allows RPPC a 30-day option to buy the shares itself. (*Id.* § 2.02.) The company gets a favorable pricing mechanism, paying the lesser of two amounts: the price offered by the third party, or a formulaic "value per share" calculated under Article 4 of the agreement. If the company passes, Section 2.03 gives the remaining stockholders an additional 30 days "to exercise their option to purchase their proportionate shares of the common stock not purchased by the Corporation at the price the Corporation would have been required to pay pursuant to Section 2.02 hereof[.]" (*Id.* § 2.03.) Finally, if neither RPPC nor one of its stockholders exercised their option to purchase, "the selling Stockholder shall be entitled to sell or transfer to the proposed transferees[.]" (*Id.* § 2.04.)

Warrington first asked RPPC to buy back his shares in 2015. (Doc. 413 at ¶ 13.) Over the next several years, Warrington's relationship with Defendants soured. Through a series of contentious emails, the parties disagreed as to the value of the company, and more importantly, the value of Warrington's shares. (*Id.* ¶¶ 14-15.) The dispute only escalated from there.

Warrington's counsel, Frank Caruso, lodged formal demands for RPPC's books and records in October 2019 and again in January 2020. The parties dispute whether these demands were ever rescinded. (Doc. 428 ¶ 18.) Finally, in April 2021, RPPC put an offer on the table: $2,831,766 for Warrington's shares, relying on a valuation prepared by Dr. Michael Crain. (Doc. 413 at ¶ 24).

Warrington declined the offer. Instead, on June 18, 2021, Caruso sent RPPC "written notice of [Warrington's] desire to sell all of his shares" to a third party, Special Purpose Vehicle Whitefish Bay. (Doc. 416-44.) The letter laid out the terms of the proposed deal as follows:

> In accordance with the Buy-Sell Agreement of September 1998 and specifically Paragraph 2, this letter shall serve as written notice of my client's desire to sell all of his shares in RPPC as follows:
>
> 1. 7,010 shares.
> 2. Special Purpose Vehicle ("SPV") Whitefish Bay.
> 3. $7,590,000 USD with 10% deposit and balance upon completion of due diligence and transfer of shares.
>
> Please be advised that the Corporation has 30 days from receipt of this letter to exercise its option to purchase the shares.

(Doc. 416-44.) RPPC confirmed receipt of the letter. (Doc. 416 at ¶ 9.)

When thirty-days passed without word from RPPC, Caruso wrote back on August 23, 2021, declaring that the company had waived its purchase option. (Doc. 413 ¶ 29.) RPPC responded, insisting that the proposed

transaction was improper because the June notice failed to comply with the strict requirements of the Buy-Sell Agreement. Specifically, RPPC complained that the notice lacked definite terms and rested on an impermissible due diligence contingency. (Doc. 416-9 at 2-3.)

Caruso then sent another letter that pivoted from the initial deal. He said that the buyers had agreed to purchase only a "portion" of Warrington's shares, while acknowledging that these new shareholders would eventually need to sign the Buy-Sell Agreement to comply with Section 2.04. On September 27, 2021, Defendants responded, pointing again to the offer's noncompliance with the Buy-Sell Agreement and questioning whether the offer was bona fide. (Doc. 413 at ¶ 32.)

This lawsuit followed. The complaint paints a picture of a controlling shareholder run amok, alleging that Patel "repeatedly engaged in conduct that prioritized his personal wealth over the interests of the corporation, including self-dealing and misuse of company assets." (Doc. 1 at 2.) At the heart of the dispute is the flow of money. Warrington complains that, save for a single transaction in 2009, his equity stake has yielded him nothing. Even that 2009 payment is fiercely contested: Defendants call it a dividend, while Warrington insists it was a loan. The parties also spar over RPPC's books, trading accusations about whether the company's financial statements are accurate and whether Defendants improperly precluded Warrington's requests to see

them. Finally, the parties dispute Patel's compensation structure, the propriety of certain loans RPPC has made to Patel, and whether Patel used RPPC's funds to bankroll his lifestyle.

The complaint includes seven claims for relief: Count I Breach of Contract, Count II Breach of the Covenant of Good Faith and Fair Dealing, Count III Tortious Interference with a Contract or Business Relationship, Count IV Breach of Fiduciary Duty–Direct Action, Count V Breach of Fiduciary Duty–Shareholder Derivative Action, Count VI Securities Fraud, and Count VII Punitive Damages. (*See* Doc. 1.)

Defendants have filed a counterclaim for Breach of Fiduciary Duty. According to RPPC, Warrington made false and disparaging statements about its management and business practices. Defendants allege this conduct amounted to outright extortion—featuring threats to instigate government investigations and a $65 million demand delivered during a settlement conference—all engineered to force the company into buying his shares at an inflated price. (*See* Doc. 170.)

## II. Legal Standard

Summary judgment is not a substitute for trial. It is appropriate only "when a movant shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law." *Gonzalez v. Indep. Ord. of Foresters*, No. 24-10758, 2025 WL 337898, at *2 (11th Cir. Jan. 30, 2025).

"When deciding a motion for summary judgment, a judge is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Las Brisas Condo. Homes Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 2:21-CV-41-KCD, 2023 WL 8978168, at *1 (M.D. Fla. Dec. 28, 2023). If the record is so one-sided that a party must prevail as a matter of law, summary judgment is appropriate.

The mechanics are straightforward. The moving party bears the initial burden. They must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must then step up, go beyond the pleadings, and point to specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "An issue is genuine if a reasonable jury could return a verdict for the nonmoving party." *Do v. Geico Gen. Ins. Co.*, No. 1:17-CV-23041-JLK, 2019 WL 331295, at *2 (S.D. Fla. Jan. 25, 2019). On cross-motions for summary judgment, as here, we view the facts in the light most favorable to the nonmoving party on each motion. *Daniels v. Exec. Dir. of Fla. Fish & Wildlife Conservation Comm'n*, 127 F.4th 1294, 1301 (11th Cir. 2025); *Signor v. Safeco Ins. Co. of Illinois*, 72 F.4th 1223, 1227 (11th Cir. 2023).

## III. Discussion

### A. Warrington's Motion for Summary Judgment

We start with Defendants' counterclaim for breach of fiduciary duty because it requires much less untangling. Warrington argues that he is entitled to judgment as a matter of law because Delaware law governs, and under Delaware law only majority or controlling shareholders (of which he is neither) owe fiduciary duties to a corporation. (Doc. 416 at 11-13.) Defendants, however, insist that Warrington waived this choice-of-law argument at the motion to dismiss stage. "Since September 2023, the parties and the Court have understood that Florida law applies, and Warrington gives no reason to depart from that now." (Doc. 426 at 5.)

As a general rule, "parties cannot waive or forfeit the application of the correct law." *United States v. Holland*, 117 F.4th 1352, 1360 (11th Cir. 2024). While a choice-of-law argument can sometimes be waived if a party sits on its hands for too long, that is not the case here. *See Riverside Apartments of Cocoa, LLC v. Landmark Am. Ins. Co.*, 505 F. Supp. 3d 1293, 1303 (M.D. Fla. 2020). Neither side asked for a definitive choice-of-law ruling at the pleading stage. In fact, Defendants urged the Court to defer resolving the nature of Warrington's duties "until at least the summary judgment stage." (Doc. 133 at 5.) Because the choice-of-law question remained undeveloped, Florida law acted as a convenient placeholder. The Court declines to lock the parties into

that placeholder now—especially after Defendants asked to defer the reckoning.

Because this Court sits in diversity, Florida's choice-of-law rules dictate which substantive law governs the dispute. *U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008). Florida follows the "internal affairs doctrine," which commands that the law of the state of incorporation controls claims involving a company's internal governance, including fiduciary duty claims against a shareholder. *Freedman v. magicJack Vocaltec Ltd.*, 963 F.3d 1125, 1133 (11th Cir. 2020). Because RPPC is a Delaware corporation, Warrington is correct that Delaware law applies to the counterclaim. *See, e.g.*, *Mukamal v. Bakes*, No. 07-20793-CIV, 2008 WL 11391157, at *2 (S.D. Fla. May 20, 2008).

"Under Delaware law a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation." *Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987). Because Warrington undisputably owns just 6.05% of RPPC's shares, Defendants' breach of fiduciary duty claim survives only if he exercised control over the company's business affairs.

"A minority shareholder exercises actual control only when it has such formidable voting and managerial power that it, as a practical matter, is no differently situated than if it had majority voting control." *In re Franchise*

*Servs. of N. Am., Inc.*, 891 F.3d 198, 211 (5th Cir. 2018). No evidence supports that finding here. In fact, Patel testified that Warrington was a "passive shareholder" in RPPC. (Doc. 416-3, Patel Depo. at 25:22-26:3, 47:23.) Defendants cannot praise Patel for single handedly building RPPC "from almost nothing to a success" (Doc. 413 at 2), while simultaneously claiming Warrington ran the show in order to salvage their claim. Accordingly, summary judgment is granted in favor of Warrington on Defendants' counterclaim.

Warrington separately asserts that he is entitled to partial summary judgment on certain portions of his claims against Defendants. Specifically, he asks the Court to make a binding determination that (1) the June 18, 2021 letter (the Whitefish notice) satisfied the requirements under § 2.01 of the Buy-Sell Agreement, and (2) "neither RPPC nor any stockholder timely exercised their option to purchase the shares as provided in the Buy-Sell Agreement or timely objected in response to Warrington's notice." (Doc. 416 at 21.) Defendants respond that the Whitefish notice was not compliant with § 2.01, and therefore, raised no other obligations under the agreement. (Doc. 426 at 15-16.)

The Court finds that genuine disputes of material fact preclude judgment as a matter of law as to the sufficiency of the Whitefish notice. First, the parties sharply dispute whether the Whitefish offer was bona fide. (*See*

Doc. 426 ¶ 8.) Moreover, while Warrington contends that the offer complied with the Buy-Sell Agreement by specifying the name of the proposed transferee as "SPV Whitefish Bay" (Doc. 428 ¶ 26), Defendants argue that the notice was insufficient because Whitefish was never formed as a legal entity and its members were not disclosed until October 15, 2021—rendering the offer "null and void." (Doc. 413 at 14.)

Summary judgment allows the Court to "resolve purely legal questions" but not to weigh evidence. *Rodriguez v. Procter & Gamble Co.*, 465 F. Supp. 3d 1301, 1314 (S.D. Fla. 2020). Resolution of either of the above disputes requires the Court to weigh key issues of fact for which both parties have proffered evidence, including deposition testimony from prospective members of Whitefish Bay and RPPC's corporate representative. (*See* Deposition of William Majcher, Doc. 428-18; Deposition of Jason Sharkey, Doc. 428-11; Deposition of Eduardo Carneiro, Doc. 428-9). These issues include whether Whitefish and its members agreed to be bound by the Buy-Sell, possessed the intent and financing to close the deal, and the effect of the deal's later conversion to a much smaller agreement for only 7% of Warrington's shares.

Because credibility is "ordinarily the province of the fact-finder at trial[,]" these are jury questions. *See Arthur v. Thomas*, 974 F. Supp. 2d 1340, 1352 (M.D. Ala. 2013). Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020). The parties can address the reach of the § 2.01 notice requirements as needed through motions in limine and jury instructions.

**B. Defendants' Motion for Summary Judgment**

Defendants, for their part, move for summary judgment on each of Warrington's claims. Although the Court is mostly unpersuaded, it will address Defendants' arguments in turn.[3] The parties agree that Florida law governs most of Warrington's claims, so the Court will follow suit except where noted. (*See* Doc. 412 at 12 n.2.)

*i. RPPC's obligation to provide a "Data Room" and other financial documents to Whitefish*

In his complaint, Warrington alleges that RPPC breached both the Buy-Sell Agreement and its duty of good faith and fair dealing by "ignore[ing] requests to provide a virtual data room for due diligence" (Doc. 1 at ¶ 40) and

[3] Because the Court has found that issues of material fact preclude summary judgment on the sufficiency of the Whitefish notice, the Court will not address Defendants' arguments regarding the same.

withholding certain financial information. (Doc. 1 at ¶ 51.) Defendants assert that RPPC was neither obligated to provide a virtual data room under the Buy-Sell Agreement nor any other financial information under its duty of good faith and fair dealing. (Doc. 413 at 13-16.)

The Court agrees with Defendants that RPPC had no obligation under the Buy Sell Agreement to "provide a data room" simply because a third-party offer included a due diligence contingency. Although Section 2.01 of that agreement requires the transferor to specify the "terms of consideration," that provision does not obligate RPPC to fulfill the seller's buyer-imposed contingencies. (Doc. 428-1 § 2.01.)

However, genuine issues of material fact preclude summary judgment on Warrington's claim that Defendants breached the duty of good faith and fair dealing by withholding financial information and thwarting the sale.

As Defendants see it, RPPC was "justified in declining to provide confidential financial documents to the unnamed and unknown members of Whitefish" (Doc. 413 at 15), because the corporation reasonably believed that the offer was fake, and a breach of good faith claim will not lie when the defendants' actions arose out of "honest mistake, bad judgment or negligence." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1329 (11th Cir. 2012). In support, Defendants present evidence that the Whitefish offer was "orchestrated by Caruso to manufacture claims for this litigation, not bona fide, and backed by

shadowy figures[,]" including emails sent from Warrington threatening litigation and expert testimony suggesting such a sale was unlikely. (Doc. 413 at 15-16).

Warrington, for his part, presents deposition testimony from himself, Caruso, and members of Whitefish demonstrating that "there is ample evidence Whitefish could and would have completed the sale." (Doc. 428 at 13-14). Because the determination of whether Defendants acted in bad faith or under a reasonable belief turns on competing testimony and witness credibility, the Court agrees with Warrington that this dispute must be resolved by a jury.

*ii. Tortious Interference Claim*

To establish a claim of tortious interference with a business relationship under Florida law, a plaintiff must show: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Euclid Turnaround Opportunity Fund LP v. Amerant Equip. Fin.*, No. 25-CV-20647, 2025 WL 3905174, at *10 (S.D. Fla. Oct. 6, 2025).

Warrington maintains that Defendants tortiously interfered with the contractual relationship between himself and Whitefish Bay SPV by "fail[ing]

to respond to Warrington's requests for a virtual data room so that the purchaser could conduct due diligence, forcing the alteration of the sale agreement, and refus[ing] to provide Warrington with the shares or share certificate, preventing Warrington from performing his portion of the sale contract." (Doc. 1 at ¶ 59.) Defendants claim that they are entitled to summary judgment here because (1) any action by RPPC was justified to protect its interests, and (2) RPPC had a supervisory and/or financial interest in the relationship between Warrington and the members of Whitefish. (Doc. 413 at 17-18.)

To be sure, Florida law allows a defendant to protect its own economic interests without facing liability for tortious interference. *Horizons Rehab., Inc. v. Health Care And Ret. Corp.*, 810 So. 2d 958, 964 (Fla. Dist. Ct. App. 2002). But RPPC's theory that withholding due diligence was necessary to "assure the continuity of the management and control" of RPPC fails on summary judgment because it requires the Court to resolve several factual inferences in its favor.

What is more, the record contains multiple facts that muddy Defendants' narrative. First, RPPC did not learn until discovery that certain Whitefish members planned to flip their shares after the sale, meaning a reasonable juror could conclude that its purported evidence (deposition testimony from members of Whitefish) could not have motivated the refusal at the time.

Second, because Warrington held only a 6% stake in the corporation, a jury could reasonably conclude that thwarting the sale was unjustified. Whether the record ultimately support's RPPC's defense is a fact question. A reasonable factfinder might agree with RPPC's inferences, or it might not. But at this stage, the Court is not convinced.

*iii. RPPC's obligation to conduct a valuation*

As part of his breach of contract claim against Defendants, Warrington alleges that RPPC "failed to provide regular valuations of the corporation in accordance with Section 4.02 [of the Buy Sall Agreement.]" (Doc. 1 at 10.) Section 4.02 defines the term "Value Of The Corporation" and states it "shall be determined every two years pursuant to . . ." an appraisal process involving the selling stockholder and the purchasing stockholder. (Doc. 413-1 § 4.02.) Defendants maintain that they are entitled to summary judgment on this claim because, as they see it, RPPC's obligation to conduct such a valuation is limited to when a stock purchase occurs. (Doc. 413 at 18-19.)

The Court agrees with Defendants. A cardinal rule of contract interpretation requires courts to read an agreement as a whole, rather than plucking a single phrase out of context. When read in full, Article 4 governs the "Purchase Price of Common Stock." Section 4.01 explicitly kicks in only "[i]f the Corporation or any Stockholder purchases Common stock." Section 4.02 then defines how to calculate that price, laying out an appraisal process that

strictly requires the participation of both the "selling" and "purchasing" stockholders. Warrington's interpretation—that Section 4.02 requires a semi-annual valuation—divorces the "every two years" language from its natural habitat. Reading it as a free-floating obligation to value the company is incompatible with the surrounding text. RPPC's duty to conduct an appraisal is inextricably tethered to an actual stock purchase. It is not a standalone, biannual chore.

*iv. Patel's transfer of shares to his family members*

Defendants also seek summary judgment on Warrington's claim for breach of contract as it relates to certain shares of stock that Patel gifted to members of his family and his trust without undergoing the mandated appraisal and valuation process. Defendants assert that this claim fails because Warrington consented to the transfers, and in any event, the five-year statute of limitations for a contract claim as to the 2010 and 2013 transfers passed long before the instant litigation. (Doc. 413 at 19). Defendants further assert that the claim is barred under the doctrine of laches and equitable estoppel. (*Id.*) Warrington responds that he did not (and could not) have consented to such transfers. And further, the breaches of § 4.02 are not time-barred because "Defendants did not determine the corporation's value every two years and, thus, breached the BSA at least twice during the five years before this lawsuit." (Doc. 428 at 17.)

Although the Court agrees with Warrington that any breaches within the five years immediately prior to the instant litigation are not time-barred, Defendants are correct that the five-year statute of limitations has passed insofar as Warrington asserts a breach of contract claim related to the 2010 and 2013 transfers. *See Jeunesse, LLC v. LifeWave, Inc.*, No. 6:15-CV-131-0RI-28, 2015 WL 4911349, at *2 (M.D. Fla. Aug. 17, 2015) ("The Florida statute of limitations for breach of contract is five years . . . [and] the date of accrual is the date of the first breach."). Accordingly, Defendants' motion is granted as to the 2010 and 2013 transfers.

*v. Warrington's Breach of Fiduciary Duty claim*

Defendants next move for summary judgment on Warrington's claim for breach of fiduciary duty. (Doc. 413 at 21). As a preliminary matter, Defendants assert that Warrington's claim is barred by the applicable four-year statute of limitations. (*Id.* at 27). But as Warrington responds, his fiduciary duty claims are not barred under the continuing torts doctrine because "Defendants' breaches of their fiduciary duties never ceased." (Doc. 428 at 25); *See Goldsworthy v. Dist. Sch. Bd. of Collier Cnty., Fla.*, No. 2:17-CV-239-JES-CM, 2018 WL 3536081, at *2 n.1 (M.D. Fla. July 23, 2018) (explaining that under the continuing torts doctrine, "the statute of limitations period runs from the date the continuing tortious conduct ceases").

Insofar as Warrington complains that he has not received a dividend from RPPC since 2009, Defendants posit that RPPC "had a compelling justification" not to issue such dividends in the form of a complicated and changing regulatory market which required "access to tens if not hundreds of millions of dollars." (Doc. 413 at 23.) As Defendants see it, RPPC's need for large cash reserves justifies both the lack of distributions and its "immediately recoverable" loans to Patel, the majority shareholder. (*Id.* at 24). As for Warrington's allegation that Patel receives "excessive compensation" for his work as CEO, Defendants maintain that "Warrington has failed to present any evidence that Patel was overcompensated" and points to testimony from Warrington that Patel "can have any salary he wants[.]" (Doc. 413 at 25.)

To justify Patel's compensation in the form of both salary and royalty payments (for the use of his name) Defendants present testimony from "compensation expert" Brent Longnecker that Patel was undercompensated in light of his experience and skills. Defendants also present testimony from RPPC's corporate representative, Eduardo Carneiro, highlighting the corporation's financial needs.

Warrington, for his part, asserts that the lack of dividends, corporate loans, and excessive compensation all constituted various ways that RPPC funneled money to Patel in order to "squeeze out" Warrington. What is more, according to Warrington, Patel reaped the financial benefits of RPPC while

passing tax liability to Warrington as a Subchapter S corporation. (Doc. 428 at 23-24). In support of his claim, Warrington presents the testimony and report of his expert James S. Feltman, CPA, CFF concluding that "there is little evidence that the interests of the minority shareholder are considered or protected" by RPPC and that Patel is "far and away the largest beneficiary of [RPPC]'s financial performance." (Doc. 248-22 at 31-32). The Court finds that Warrington has presented sufficient evidence to create a dispute of material fact as to whether Patel was overcompensated.

Finally, to the extent Defendants assert that they are entitled to judgment as a matter of law because, as they see it, Warrington's expert failed to provide an opinion on how the alleged breaches changed the value of his shares, the Court agrees with Warrington that a reasonable jury could conclude that "there is little to no commercial value for Warrington's shares because they rendered them unmarketable" by Patel and RPPC. (Doc. 428 at 28.) In any event, the Court finds sufficient Warrington's expert opinion that "[e]conomic harm to Mr. Warrington relative to his ability to recover market value of his common share interests is $10.3 million to $12.4 million dollars." (Doc. 428-22 at 31.) Any later limitations to that damage amount can be fleshed out in the form of jury instructions at the time of trial.

*vi. Warrington's Shareholder Derivative Suit*

Defendants seek summary judgment on Warrington's shareholder derivative claim for two reasons. First, they assert that the derivative claim fails because Warrington failed to make the requisite pre-suit demand or adequately plead futility. (Doc. 413 at 31.) Second, Defendants argue that summary judgment should be granted because Warrington has failed to present an issue of fact as to any self-dealing on the part of Patel or usurpation of corporate opportunities related to loans made to Patel's Burn by Rocky Patel Cigar Lounges and tobacco farms. (*Id.* at 30-31.)

"Delaware corporate law requires a shareholder who intends to initiate a derivative action on behalf of a corporation to either make a demand on the board of directors to rectify the alleged wrongs or show why demand is excused." *Whitten v. Clarke*, 41 F.4th 1340, 1343 (11th Cir. 2022). One situation wherein the pre-suit demand requirement is considered excused, is "if a majority of the board of directors faces a substantial likelihood of liability." *Id.* The Court finds that Warrington has successfully pled and supported demand futility. (*See* Doc. 1 at ¶ 77 ("Because Rocky is the president and controlling shareholder, Warrington believed a demand to the corporation to rectify his wrongdoing would be futile.").)

Defendants aver that Warrington waived his demand futility argument through a letter sent on June 9, 2013—a year after Warrington filed his

complaint. (*See* Doc. 413-1 at 417-419.) True, "[w]hen a demand is made, the question of whether demand was excused is moot." *See Spiegel v. Buntrock*, 571 A.2d 767, 775 (Del. 1990). Here, however, Warrington sent the letter to RPPC's counsel of record a full year after filing suit. Because the letter was sent after litigation was already underway, the Court finds that it did not (and could not) constitute a "pre-suit" demand and therefore did not functionally waive Warrington's demand-futility argument. The Court also agrees with Warrington that the same issues of fact precluding summary judgment as to his direct action for breach of fiduciary duty (Count IV) also preclude judgment as a matter of law on his shareholder derivative claim (Count V).

*vii. Securities Fraud Claim*

In Count VI, Warrington brings a claim against Defendants for securities fraud. Defendants assert that they are entitled to judgment as a matter of law on this claim because "[t]here is no evidence" that Patel ever made fraudulent statements to Warrington about the company's valuation. (Doc. 413 at 33.)

Among other things, a claim for securities fraud requires the defendant to make "a misrepresentation or omission of a material fact[.]" *Gochnauer v. A.G. Edwards & Sons, Inc.*, 810 F.2d 1042, 1046 (11th Cir. 1987). In support of his claim, Warrington presented his own deposition testimony that Patel had advised him that RPPC was worth $100 million or more. Defendants aver that because, when pressed for details, Warrington could not remember any

about the timing and concept of Patel's statements, his deposition testimony is not sufficient to survive summary judgment. But as Defendants concede within their own motion, Warrington testified that Patel "proposed a valuation somewhere between $100 million and $150 million" for RPPC (the what) "before [a] meeting with Mr. Wang, a potential advisor" (the when). (Doc. 413 at 34.)

In the Eleventh Circuit, "case law recognizes that, even in the absence of collaborative evidence, a plaintiff's own testimony may be sufficient to withstand summary judgment." *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1160 (11th Cir. 2012). True, "[m]ere conclusions and unsupported factual al legations are legally insufficient to defeat a summary judgment motion[,]" *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005), but the Court finds Warrington's deposition testimony sufficiently specific, at the summary judgment stage, to create triable issue of fact as to whether Patel made certain statements to Warrington about the valuation of RPPC.

Defendants further assert that they are entitled to judgment as a matter of law on Plaintiff's Securities Fraud claim because "Warrington's claimed damages for lost opportunities—either $7.59 million for the June 18, 2021 attempted sale or $541,370 for the October 15, 2021 attempted sale—cannot be considered true losses[,]" given the deficient Whitefish notice. As the Court previously found, an issue of material fact remains as to whether the June 18,

2021 letter constituted sufficient notice under Section 2.01 of the Buy-Sell Agreement.[4]

Accordingly, it is now **ORDERED**:

1. Plaintiff's Motion for Summary Judgment (Doc. 416) is **GRANTED IN PART** and **DENIED IN PART.** Summary Judgment is **GRANTED** in favor of Plaintiff and against Defendants, who shall take nothing, on the counterclaim. The motion is otherwise **DENIED.**
2. Defendants' Motion for Summary Judgment (Doc. 413) is **GRANTED** as to the issues and claims noted above that cannot survive. The motion is otherwise **DENIED.**
3. The clerk shall withhold judgment on the counterclaim until the conclusion of the case.

**ENTERED** in Fort Myers, Florida on September 8, 2026.



Kyle C. Dudek
United States District Judge

[4] To the extent Defendants ask the Court to determine which of Warrington's evidence for his securities fraud claim are valid under Florida's two-year statute of limitations, the Court finds that that determination is more properly addressed through the vehicle of motions in limine prior to trial.